REDMANN, Judge.
Plaintiff appeals from the dismissal of his suit for damages sustained in falling about defendant’s public transit bus.
Plaintiff testified he did not report the 5:30 p. m. incident to the bus driver because he did not consider himself more than shaken up. But he testified he attempted to report the driver’s improper driving to defendant that evening, and it is established plaintiff did report the incident to defendant the following morning, giving the number of the bus. Two days thereafter defendant’s claim investigator visited plaintiff. “He complained about his leg and being a little shaken up. He said he wasn’t making any claim. * * * He said it didn’t amount to anything and to forget it. Bring the release around and I’ll sign it.”
Unfortunately plaintiff’s condition progressively worsened, medical expenses mounted, and he ultimately had to accept *421 a demotion in his employment. Plaintiff testified that on the suggestion of his employer’s attorney he contacted an attorney two or three months after the accident, and this suit was brought about ten months after the incident when plaintiff’s physician advised him he would not recover from his disability.
The trial judge in written reasons observed plaintiff
“ * * * made no complaint to the bus driver; there were no witnesses to the accident.
“Under these conditions where no accident was reported to the bus driver and no complaint was made to the bus driver, it is not proper to expect the bus driver to explain what caused the incident. The court feels that the burden of proof is upon the Plaintiff to prove an accident before the burden shifts to the defendant to relieve himself of negligence.
“The Court feels that Plaintiff has not carried the burden of proof.”
We understand the trial court’s fundamental reasoning to be that of its last two sentences. The trial court does not assert a rejection of plaintiff’s evidence, but merely a view it was insufficient to carry the burden of proof. We accordingly review the evidence to determine the legal question whether the evidence was sufficient under the circumstances.
It appears fairly established that plaintiff did notify defendant of the incident the following morning and that two days thereafter plaintiff advised defendant’s investigator plaintiff was not only not making a claim, but was ready to sign a gratuitous release. Five days later, apparently responding to the investigator’s advice that a release could not be executed without consideration, plaintiff was claiming only for damage to his eyeglasses “but am not making a claim for injury unless there may be something wrong that I do not know about and will let one of the Company Doctors make an examination.”
In fact, nothing of any serious consequence appeared to be “wrong” with plaintiff during the period immediately following the alleged incident. Thus, at the time he reported the incidentt and for many days thereafter, he had no knowledge that his damages might be serious. He could not at that time have concocted a fake accident in order to recover damages, because the damages were not yet in sight, and so far as we can find from the record, he had no reason to anticipate any results of any consequence from the incident.
Thus if his report was a fabrication, its purpose at the time could only have been to collect nominal damages. To assume plaintiff’s immediate disclaimer of any nominal damages was but part of a clever scheme to gain credence and finally collect substantial damages (from an accident he had fabricated in the first place), we would first have to suppose plaintiff had some way of foreknowing he would shortly develop the injuries he did experience.
Yet Dr. G. M. Morlier, to whom defendant sent him, and who was the first physician to examine him, reported only tenderness and “moderate degree of muscle spasm of the paravertebral musculature cervical area bilaterally * * * and m limitation of motion of the neck”, as of October 15, 1965, a week after the alleged incident. But Dr. J. Browne Larose, Jr., plaintiff’s own general practitioner, who examined plaintiff on October 26, on that date found “limitation of all motion of the neck, approximately sixty percent,” and “tenderness and spasm of all muscles of the neck and in fact of all paraspinous muscle group from the buttock to the neck.”
We think this evidence fairly proves that plaintiff’s ultimate condition was not in existence at the time he reported the bus incident and that he could not at that time have known he would become dis *422 abled; and accordingly it cannot be supposed he invented the incident in order to recover for damages which later appeared.
Thus there is not only not any inherent inconsistency in plaintiffs testimony, but to the contrary we think the evidence shows plaintiff’s report of the incident was made at a time completely nonsuspect, when he would have had virtually nothing to gain by making a false report.
To all this we add the circumstances that plaintiff has always been gainfully employed, and as far as the record shows a responsible ordinary citizen; and that plaintiff’s wife corroborates his having been noticeably unwell on arriving home after the alleged incident (“mostly shook up and really nauseated”) ; and that plaintiff’s son corroborates his then general discomfort and nausea.
We have said we do not understand the district judge to have disbelieved plaintiff, and our view from all the foregoing is that there is no reasonable basis to disbelieve plaintiff.
The lack of an immediate report to the bus driver is a circumstance which may indicate indirectly that no accident occurred, as suggested in Johnson v. Shreveport Rys. Co., 50 So.2d 655 (La.App.1951), cited by defendant. But in that case there was no report of the accident to the transit company. Here defendant .did report the accident the following morning.
A lack of a report might also prejudice a defendant’s possibility of absolving itself of negligence. Yet here, as in Tomasik v. Shreveport Rys. Co., 98 So.2d 554 (La.App.1957), there was a report the following morning and defendant had the opportunity the day after the incident to question its driver and fix in his memory whatever circumstances he might so shortly after the incident have recalled. Here, however, unlike in Tomasik, defendant did not discuss the incident with its driver until his discovery deposition was taken, and consequently the driver remembered nothing at all of his actions of the day of the incident.
We conclude plaintiff’s evidence was sufficient to prove his injury on the bus, which establishes in his favor as a fare-paying passenger a prima facie case of negligence and obliges the defendant carrier to rebut that case; Wise v. Prescott, 244 La. 157, 151 So.2d 356 (1963).
Defendant offered no testimony to rebut the prima facie negligence case, but argues applicability of the principle that a passenger must anticipate and protect himself against the natural movements of stopping, starting and turning, Gaines v. Baton Rouge Bus Co., 175 So.2d 719 (La.App.1965). In that case there was testimony from defendant’s witnesses, including other passengers, that the bus’s movements were normal.
Here the only testimony is that of plaintiff, and his testimony is that after a normal start but just as he started to take his seat towards the rear of the bus there was “a sudden stop and sudden forward motion again” with swerving, which threw him first forward and then backward, causing him to fall and stumble against the seats until he ended up on a side-facing seat at the rear of the bus. The bus movements occurred prior to the next bus stop, while the bus was moving in the exclusive bus lanes in the (formerly) neutral ground of Canal Street in the central business district of New Orleans.
Plaintiff did say, in his written statement typed by defendant’s claims adjuster a week after the accident, “I do not know what caused the operator to apply his brakes then accelerate the bus but assume that either an auto made a turn in front •of the path of the bus or someone may have stepped in front of same forcing the operator to make the sudden stop then accelerate.” However, while anyone might assume a cause for the sudden stopping (which might not have been negligent) the sudden reaccelerating — which is what *423 threw the stumbling plaintiff to the rear of the bus — is not explained by any such assumption, and must be considered negligence in the absence of exculpatory proof by defendant.
In Wise v. Prescott, supra at 151 So.2d 359, our Supreme Court adopted as a statement of the applicable law that a public carrier
“ * * * is required to exercise the highest degree of vigilance, care and precaution for the safety of those it undertakes to transport and' is liable for the slightest negligence. * * * The carrier must do all that human sagacity and foresight can do under the circumstances, in view of the character and mode of conveyance adopted, to prevent injury to passengers, the carrier being held liable for the slightest negligence with reference to the exercise of such care. * * * ”
We hold defendant liable for the injuries plaintiff received in the bus incident.
The next question is the extent of those injuries.
At the time of the accident plaintiff experienced a sensation of cramps in the lower legs, between calf and heel, and had a strong feeling of nausea and blurry vision. Dr. Larose’s initial conclusion (19 days later) was that plaintiff had “a severe sprain of the cervical spine and posterior cervical musculature as well as lumbosacral spine with objective evidence of spasms and much muscle tenderness.” Treatment was physiotherapy, muscle relaxants and analgesics.
Plaintiff, 50 years old, had previously been treated by Dr. Larose for somewhat similar conditions, once on September 8, 1961 and again on March 31, 1962. X-rays then showed narrowing of the C-5, C-6 disc space, and Dr. Larose thought plaintiff then had a degenerative change and osteoarthritis. And on August 11, 1964, during a general physical examination, Dr. Larose found some stiffness and limitation of the neck.
On the effect of the accident on plaintiff’s prior condition Dr. Larose testified,
“I felt that he certainly had arthritis of the neck but his complaints were not severe in nature at any point. They seemed well controlled with routine salicylates, aspirin and anacin, and since the accident his complaint got much worse. I certainly do feel strongly that the accident aggravated his preexisting condition to a severe intent [extent].”
When Dr. Larose last saw plaintiff, some weeks before trial, plaintiff’s lower back was much improved but “he was still having a lot of trouble with the neck and still had thirty percent of limitation of motion of his neck.”
Dr. Rayburn C. Llewellyn, a neurosurgeon to whom Dr. Larose referred plaintiff for examination, testified that in July, 1966 there were positive findings limited to the neck and lower back region; on extension of the neck there was mild spasm at the lateral cervical muscle bilaterally. There were also subjective findings of tenderness. There were very mild sensory deficits on both forearms. Dr. Llewellyn stated:
“It was my opinion that this patient’s complaints as well as findings resulted in a residual of a cervical neurologic syndrome secondary to osteoarthritis. Again, the cervical disorder was mild in character. This in turn aggravated by the trauma according to the history recited by the patient. * * *
“I wouldn’t be in a position to state the trauma would actually aggravate the bone changes noted on the x-rays or the arthritis that was present, but it was my opinion as I attempted to testify that such an injury could cause pain and soreness of the character that the patient complained and such pain of *424 the muscles and ligaments in the back region as well as exists the long period of time or failure to respond to the treatment because of the existence of these x-ray findings that are diagnostic of osteoarthritis.”
However, on cross Dr. Llewellyn testified plaintiff did have normal range of motion in his neck, although he did complain within that range of a sensation of tightness and pulling or soreness. The doctor thought such complaints could be present in a person with osteoarthritic changes whether he had injury or not.
Dr. Howard Karr, also a neurosurgeon, examined plaintiff at defendant’s request on June 1, 1966. His “findings were all negative as far as any neurological disease or injury was concerned.” He found plaintiff had full or normal range of neck motion without spasms; no spasm in the lumbar region; no restriction in the straight leg raising, indicating no mechanical abnormalities. Dr. Karr found nothing attributable to the October 1965 accident, and no objective signs for plaintiff’s complaints of “occasional sharp shooting pains in the intrascapular region.”
Dr. George D. Berkett, an orthopedic surgeon, examined plaintiff for defendant on November 16, 1965, about a month after the accident. He testified:
“It is my impression that the patient may have had, it’s possible that he may have sustained a cervical injury and possibly even a mild sprain of the dorsal and lumbar spine but I was unable to find any objective evidence of any residual of this injury. However, it was my opinion then and is now and my statement to that effect in the report that a patient with injury to the cervical spine often have symptoms for some period of time after all objective findings have subsided and those are my conclusions.”
It appears to us that the preponderance of the medical testimony is that the accident could have caused the pain and suffering that plaintiff experienced by aggravating his arthritic condition, and especially in view of the testimony of Dr. Larose, his regular family physician, it is more probable than not that the accident did cause the pain and suffering.
The pain and suffering, apparently not extreme although rather constant, together with plaintiff’s depression (testified to by Dr. Larose) over lack of progress in getting over it, and the need for relatively frequent visits to the doctor, unquestionably contributed to plaintiff’s difficulties, especially in tardiness, with his work, and to his abandoning his gardening and other chores about his house, and reduced his recreational outlets. But plaintiff’s employment supervisor testified that although plaintiff had been demoted one grade, his punctuality and attendance at work had improved considerably since April of 1967. Plaintiff’s duties remain of the same kind, but his demotion meant “he would not have an opportunity to reach the same salary level in the future that he might have reached had he not been demoted.”
Our conclusion is that an award of $10,000 for plaintiff’s lengthy but not severe pain and suffering and his difficulties at home and work would do substantial justice. Medical expenses amounting to $1,080.91 are proven and will also be awarded.
Accordingly the judgment appealed from is reversed, and judgment is hereby rendered in favor of plaintiff, Jay B. Matthews, and against defendant, New Orleans Public Service, Inc., in the amount of $11,080.-91, with legal interest from judicial demand and all costs.
Reversed and rendered.